# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **ELIZABETH SEWELL, ET AL.,** | ) | **CIVIL ACTION NO. 15-3117** |
| | ) | **c/w 15-6276, 16-2326, 16-2328, 16-3120, 16-** |
| **Plaintiffs** | ) | **4233, 16-4248, 16-12368** |
| **VERSUS** | ) | |
| | ) | |
| | ) | **THIS DOCUMENT RELATES TO NO. 15-** |
| **SEWERAGE & WATER BOARD OF** | ) | **3117** |
| **NEW ORLEANS,** | ) | |
| **Defendant** | ) | |
| | ) | **SECTION "N" (3)** |
| | ) | |

## SEWELL PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

I.      SUMMARY OF ARGUMENT………………………………..………………1

II.     BACKGROUND ON THE SWB'S SELA PROJECT………..……………………...1

III.    RELEVANT CONTRACTS HOLD THE SWB RESPONSIBLE FOR THE SELA
        PROJECT……………………………...……………………………………………3
        A.      Project Cooperation Agreement……………………………….............4
        B.      Project Partnership Agreement…………………………………………4
        C.      Cooperative Endeavor Agreement…………………………….............6

IV.     THE SWB IS RESPONSIBLE FOR THE SELA PROJECT…………............................8
        A.      The SWB is Statutorily Responsible for the SELA Project…....................8
        B.      The SWB is Contractually Responsible for the SELA Project...................9
        C.      The SWB is Financially Responsible for the SELA Project……...............10
        D.      The SWB is Responsible for Property Damage Claims Caused by the
                SELA Project……………………………………………….....................11
        E.      The SWB's Employees are Involved in the SELA Project…....................11
        F.      The SWB is Responsible for the Design of the SELA Project….............11
        G.      The SWB is Involved with the SELA Project Construction……...............12
        H.      The SWB Acknowledges its Significant Involvement and Responsibilities
                for the SELA Project……………………………………….....................12
        I.      The SWB is Responsible for the SELA Project After Construction is
                Complete……………………………………………………………………13

V.      STANDARD OF REVIEW………………………………………............................14

VI.     LAW ON INVERSE CONDEMNATION…………………………………………14

VII.    *HOLZENTHAL* AND RELATED CASES DETERMINE THE SWB'S LIABILITY FOR
        INVERSE CONDEMNATION………………….................................................15

VIII.   APPLICATION OF *HOLZENTHAL* RENDERS THE SWB LIABLE TO PLAINTIFFS
        FOR INVERSE CONDEMNATION…………………………………………………18

IX.     CONCLUSION…………………………………………………….........................21

## TABLE OF AUTHORITIES

La. Const. art. I, § 4…………………………………………………………………...…15

Fed. R. Civ. P. 56 …...…………………………………………………..……………14

La. Rev. Stat. § 33:4071…………………………………………………………………...9

La. Rev. Stat. § 33:4081……………………………………………………………………...9

*Griggs v. Cnty. of Allegeny,* 369 U.S. 84 (1962)…………………………………………...17

*Cripps v. La. Dep't Agric. & Forestry*, 819 F.3d 221 (5th Cir. 2016)…………………………...14

*Krispy Krunchy Foods, LLC v. AMA Discount, Inc.,* 2016 WL 157395 (E.D. La. Jan. 13, 2016)14

*Danziger v. United States*, 93 F.Supp. 70 (E.D. La. 1950)………………………………………17

*Faulk v. Union Pac. R.R. Co.,* 2014-1598 (La. 6/30/15), 172 So. 3d 1034……………………...15

*Avenal v. State*, 2003-3521 (La. 10/19/04), 886 So. 2d 1085 ……………………………………...15

*Lombard v. Sewerage & Water Bd. of New Orleans*, 284 So. 2d 905 (La. 1973) ……………...1, 9

*Borgnemouth Realty Co., Ltd. v. Par. of St. Bernard*, 2015-1651 (La. App. 4 Cir. 5/21/14), 141 So. 3d 891………………………………………………………………………………………15, 17

*Holzenthal v. Sewerage & Water Bd. of New Orleans*, 2006-0796 (La. App. 4 Cir. 1/10/7), 950 So. 2d 55……………………………………………………………1, 4, 15, 16, 17, 18, 19, 20, 21

*W. Jefferson Levee Dist. v. Coast Quality Constr. Corp.,* 620 So. 2d 319, 329 (La. App. 5 Cir. 1993)………………………………………………………………………………………17

*Petrovich v. State*, 181 So. 2d 811 (La. App. 4 Cir. 1966)………………………………………18

*Vuljan v. Bd. of Comm'rs of the Port of New Orleans*, 170 So. 2d 910 (La. App. 4 Cir. 1965)………………………………………………………………………………………15, 18

MAY IT PLEASE THE COURT:

Plaintiffs, Elizabeth Sewell, *et al*., in Civil Action No. 15-3117 ("Plaintiffs"), respectfully submit this Memorandum in Support of Motion for Partial Summary Judgment to address the discrete issue of whether the Defendant, the Sewerage and Water Board of New Orleans ("SWB"), is liable to Plaintiffs for their inverse condemnation claims arising from the property and related damages caused by the Southeast Louisiana Urban Flood Control Program construction in the Uptown neighborhood of New Orleans, Louisiana (the "SELA Project" or "Project").[1]  The undisputed, material facts demonstrate that the SWB is the entity liable for Plaintiffs' inverse condemnation claims as a matter of law.

## I.          SUMMARY OF ARGUMENT

The SWB, and no other government agency, is liable to Plaintiffs for their inverse condemnation claims.  It is black letter law that a government agency is liable for inverse condemnation when private property is damaged as a result of that agency's public works project.  Where, as here, multiple government agencies are involved in a project, the agency with the ownership, control, and most overall responsibilities for the project is liable for inverse condemnation.  *See Holzenthal, infra*.  The undisputed, material facts in this case show that the SWB is a government agency, which owns, operates, funds, designs, and is charged with overall responsibility for the SELA Project. Critically, the SWB has also acknowledged its responsibility for property damages caused by the SELA Project.  As a matter of law, then, the SWB is the government agency liable for Plaintiffs' inverse condemnation claims.

## II.          BACKGROUND ON THE SWB'S SELA PROJECT

---

[1] Plaintiffs do not address herein the other elements of inverse condemnation, particularly causation and damages, to be proved against the SWB.  Nor are Plaintiffs' other claims against the SWB addressed in this Motion, as the jurisprudence is settled that the SWB is the proper defendant to be held liable for Plaintiffs' strict liability and negligence claims.  *See Lombard v. Sewerage & Water Bd. of New Orleans*, 284 So. 2d 905, 914 (La. 1973).

The SWB has been integrally involved in the overall SELA program since its inception over 25 years ago and remains the primary government agency responsible for the SELA Project phases at issue in this litigation.

The genesis of the SELA Project dates back to 1989, when, after record rainfall and flooding in and around Orleans Parish, federal and local interests, including the SWB, began investigating and planning flood risk reduction measures to implement in the area.  *See* Ex. A, p. 5 (Wingate Decl.).  Thereafter, the U.S. Congress provided appropriations and authorized the construction of canals and pumping stations in and around Orleans Parish to alleviate flooding.  *See id.* at p. 6.  These measures were identified as the greater Southeast Louisiana Urban Flood Control Program, known as "SELA."  *See id.*  The SELA program supports Orleans Parish's master drainage plan and provides flood risk reduction in the area for a ten-year rainfall event.  *See id.* at p. 5.

Over the decades, the SWB and U.S. Army Corps of Engineers (the "Corps") have implemented the greater SELA program in multiple stages in Orleans Parish.  The initial phases of the SELA program were completed between 2002 and 2006.  *See id.* at p. 11.  After Hurricane Katrina, additional funds were appropriated to accelerate the SELA program, culminating in U.S. Congress' appropriation of an additional $1.3 billion for the SELA program.  *See id.*; Ex. B, pp. 5-6 (Exnicios Decl.); R. Doc. 146, ¶ 34.  These funds are to be cost shared at 65% federal and 35% local pursuant to a 30-year Deferred Payback Agreement ("DPA").  *See* Ex. C (DPA); *see also* Exs. A at p. 6, B at pp. 5-6.  The 2008 appropriation provided the opportunity for the construction of the SELA Project phases at issue in this litigation.  *See* Ex. A, p. 11.

There are seven current SELA Project phases at issue in this litigation.  *See* Exs. A at p. 5, D at p. 1 (SWB Answers to Interrogs.), E at pp. 3-4 (Fogerty Decl.), F (SELA Website –

2

Contract Status); G (SELA Website-Jefferson Avenue Canal Phase 1); H (SELA Website – Jefferson Ave. Canal Phase 2); Exhibit I (SELA Website – Napoleon Avenue Canal Phase 2); J (SELA Website - Napoleon Avenue Canal Phase 3); K (SELA Website – S. Claiborne Avenue Canal Phase 1); L (SELA Website – S. Claiborne Avenue Canal Phase 2); M (SELA Website – Louisiana Avenue Canal).[2]   The construction sites for these phases span the four major avenues in Uptown New Orleans, specifically, South Claiborne Ave., Jefferson Ave., Napoleon Ave., and Louisiana Ave, as well as a portion of Prytania St. near Jefferson Ave.  *See id.*

Construction on the SELA Project phases started at various times, the earliest beginning September 2011, and to date, the SELA Project is not yet completed, with some end dates projected not until late 2018.  *See* Exs. A at p. 5, D at p.1, E at pp. 3-4, F-M.  Three contractors, B&K Construction, Inc., Cajun Constructors, Inc., and Boh Bros. Construction, Co. (collectively the "Contractors"), were hired for hundreds of millions of dollars to construct the SELA Project. *See id.*; *see also* Ex. E at p. 2.

SELA Project construction activities, including but not limited to construction-related vibrations, pile-driving, demolition, movement of heavy equipment and vehicles, soil compacting, excavating, dewatering, emitting dust, noise, and debris, have significantly damaged and continue to damage Plaintiffs' properties on and near the Project construction sites.  *See* (R. Doc. 140).  These damages form the basis of Plaintiffs' inverse condemnation claims.  *See id.*

### III.          RELEVANT CONTRACTS HOLD THE SWB RESPONSIBLE FOR THE SELA PROJECT

---

[2] The seven SELA Project phases at issue are formally known as follows: (1) SELA 21 – Jefferson Ave. Phase 2 (S. Claiborne to Dryades), (2) SELA 22 – Jefferson Ave. Phase 2 (Dryades to Constance), (3) SELA 23 – Napoleon Ave. Phase 2 (S. Claiborne to Carondelet), (4) SELA 23a – Napoleon Ave. Phase 3 (Carondelet to Constance), (5) SELA 24a – Claiborne Ave Phase 1 (Monticello to Leonidas), (6) SELA 24b – Claiborne Ave. Phase 2 (Leonidas to Lowerline), and (7) SELA 27 – Louisiana Ave. (S. Claiborne to Constance).  *See* Exs. A at p. 5, D at p. 1, E at pp. 3-4, F.

The SWB has been obligated to provide funding, property, design, management, and operation for the greater SELA program, including the SELA Project phases at issue in this litigation, since the mid-1990s, through several agreements.  Three of these agreements are critical to the present Motion: (1) Project Cooperation Agreement ("PCA"), (2) Project Partnership Agreement ("PPA"), and (3) Cooperative Endeavor Agreement ("CEA").

### A.    Project Cooperation Agreement

In 1997, the SWB and the Corps executed the Project Cooperation Agreement ("PCA"), which required the federal government to provide 75% of the SELA project costs and the SWB to provide the remaining 25% of costs.  *See* Exs. A at p. 8, N at p. 6 (PCA).  Pursuant to the PCA, the SWB is responsible for contracts, plans, specifications, requesting betterments, consultation for property rights, participating in the Project Coordination Team, and holding and saving the Corps from damages caused by the project.  *See* Ex. N.

The SWB and the Corps implemented and funded several prior SELA program phases in Orleans Parish pursuant to the terms of the PCA.  *See* Exs. A at p. 11, F. Notably, the SWB's obligations under the PCA and its involvement with these earlier phases of the SELA program became the subject of property damage litigation similar to that at issue herein and resulted in the imposition of liability against the SWB for inverse condemnation.  *See Holzenthal, infra* at pp. 15-17.

### B.    Project Partnership Agreement

On January 16, 2009, the Corps and the Coastal Protection and Restoration Authority of Louisiana ("CPRA"), as the "Non-Federal Sponsor," executed the Project Partnership Agreement ("PPA") to administer and implement phases of the SELA Project in the "territorial jurisdiction

of the [SWB]." Ex. O at p. 1 (PPA).  For all substantive purposes, the PPA is similar to the PCA.  *See* Ex. O; *compare* Ex. N.

Critically, the PPA provides that CPRA "plans to enter into a Cooperative Endeavor Agreement or other sub-agreements, in accordance with the Constitution and laws of the State of Louisiana, with…the [SWB] for the performance of [CPRA's] obligations under [the PPA]." Ex. O at p. 1.  Thus, the SWB is responsible for the performance of the CPRA's responsibilities under the PPA as the Non-Federal Sponsor.

The PPA "set[s] forth the obligations of the [Corps] and Non-Federal Sponsor regarding the construction and the operation, maintenance, repair, rehabilitation, and replacement of the [SELA Project]." *Id*. at p. 2.  For example, the Non-Federal Sponsor is obligated to provide lands, easements, rights-of-way, relocations, and improvements required on lands, easements, and rights-of-way for the construction and implementation of the SELA Project.  *Id*. at pp. 2, 11. "[T]he Non-Federal Sponsor, or other non-Federal interest on behalf of the Non-Federal Sponsor," is also to perform work integral to the SELA Project.  *Id*. at p. 3.

In implementing the SELA Project under the PPA, the Non-Federal Sponsor is authorized to design the Project, must be given the opportunity "to review and comment on the solicitations for all contracts, including relevant plans and specifications, prior to the [Corps'] issuance of such solicitations," and must be afforded the opportunity to review and comment on all proposed contract modifications, contract claims, and change orders.  *Id*. at pp. 8-9.  The Non-Federal Sponsor also may request that the Corps demand the Contractors correct any failure or deficiency in components of the SELA Project.  *Id*. at p. 10.  Prior to completion of the SELA Project construction, "the Non-Federal Sponsor shall conduct a joint walk-through inspection and…may note any additional items as a punch-list."  *Id*.

5

The PPA requires the Non-Federal Sponsor to contribute 35% of the costs of the SELA Project construction, as well as contribute 100% of the operation, maintenance, and repair of the completed Project. *Id*. at pp. 3, 10, 14.

The PPA also mandates the creation of a "Coordination Team" composed of three representatives of the Non-Federal Sponsor and Corps. *Id*. at p. 23. The Coordination Team is to meet regularly throughout the construction of the SELA Project, stay informed as to the progress of construction and issues and actions, and shall generally oversee SELA Project plans, specifications, scheduling, real property, relocations, improvements, contract issues, compliance with legal and regulatory standards, historic preservations issues, costs, credits, final inspections, maintenance, operation, repair, rehabilitations, and replacement. *Id*. at p. 24.

The Non-Federal Sponsor, at no cost to the Corps, "shall operate, maintain, repair, rehabilitate, and replace all portions of the [SELA Project]" upon completion of the Project. *Id*. at pp. 32-33.

Finally, under the PPA: "The Non-Federal Sponsor shall hold and save the [Corps] free from all damages arising from design, construction, operation, maintenance, repair, rehabilitation, and replacement of the [SELA Project], except for damages due to the fault or negligence of the [Corps] or its [C]ontractors." *Id*. at pp. 3, 33-34.

### C.     Cooperative Endeavor Agreement

On the very same date that the PPA was executed, January 16, 2009, the SWB and CPRA entered into the Cooperative Endeavor Agreement ("CEA"), whereby the SWB assumed the CRPA's obligations for the SELA Project as the Non-Federal Sponsor. Exhibit P (CEA).

The CEA recognizes that the SWB "is a body politic and corporate with authority over the public drainage system for the city and parish of Orleans," and that the SELA Project "will

be constructed within the territorial jurisdiction of [SWB]." *Id*. at pp. 2, 3.  With regard to the PPA, the CEA states that "over objection," the Corps is requiring CPRA to be the sole signatory as the Non-Federal Sponsor, but that the CPRA and SWB "recognize that under Louisiana law" the SWB is "constitutionally and statutorily given jurisdiction and authority over internal drainage within [the SWB's] jurisdictional limit[]."  *Id*. at p. 4.

The CEA was expressly entered into to recognize that, although the CPRA signed the PPA as the Non-Federal Sponsor, the SWB will be the non-federal, local entity to directly partner with the Corps to carry out the design and construction of the SELA Project, and is the entity responsible for the operation, maintenance, repair, replacement, and rehabilitation of the Project upon completion.  *Id*.  Accordingly, the CPRA delegates its responsibilities under the PPA as the Non-Federal Sponsor of the SELA Project to the SWB.  *Id*.

The CEA further provides that the CPRA signs the PPA "on behalf of and with the approval of" the SWB, and the SWB is responsible for negotiating the PPA.  *Id*. at p. 8-9.  In addition, under the CEA, the SWB "agree[s] to assume responsibilities for any and all obligations and responsibilities assumed by CPRA as Non-Federal Sponsor as set forth in the SELA PPA regarding such responsibilities and obligations.…"  *Id*.

The CEA renders SWB responsible for coordinating implementation of the SELA Project and attending regular meetings regarding the Project.  *Id*. at p. 9.   At least one representative of the SWB is required to participate in the "Coordination Team" established for the SELA Project as set forth in the PPA.  *Id*. at pp. 11, 14.

Under the CEA, the SWB, at its "sole expense," is obligated to "operate, maintain, repair, rehabilitate, and replace the completed [SELA Project]…at no cost to the CPRA or the State of Louisiana."  *Id*. at p. 9.  Also with regard to financial obligations for the SELA Project, the SWB

acknowledges it is aware of the Non-Federal Sponsor obligations, has the financial capability to satisfy these obligations as set forth in the PPA, including the 35% cost share and 30-year payback period, and will satisfy these financial obligations.  *Id*. at pp. 4, 8-9,11.

The CEA contains a disclaimer of liability in favor of CPRA, stating that: "the State of Louisiana and/or CPRA shall have no liability or responsibility, financial or otherwise, for the construction and/or operation, maintenance, repair, replacement, or rehabilitation of the Project." *Id*. at pp. 12-13.  The CEA provides that with regard to the SELA Project, the SWB

> agrees and obligates itself and its successors and assigns to defend, indemnify, save, protect, and hold harmless CPRA and its successors, officers and employees against any and all claims, demands, suits, actions, judgments, attorney's fees, or costs arising or allegedly arising out of its responsibilities enumerated and undertaken herein, or any violation of Louisiana or Federal law or regulations, or any negligent act, omissions, operations, or work by [SWB] or its employees, agents, representatives, or contractors, except for damages to the fault or negligence of CPRA, its employees, or its contractors.  *Id*. at p. 13.

The CEA requires that the SWB to also "hold and save the [Corps] free from all damages arising from design, construction, operation, maintenance, repair, rehabilitation, and replacement of the Project, except for damages due to the fault or negligence of the [Corps] or its contractors."  *Id*.

## IV.        THE SWB IS RESPONSIBLE FOR THE SELA PROJECT

The undisputed facts are that the SWB has both statutory and contractual responsibility for the SELA Project, and has been significantly engaged in all aspects of the Project since it was in the planning stages to the current state.  Once construction is finally completed the SWB assumes full operation and control for the drainage canals.

### A.        The SWB is Statutorily Responsible for the SELA Project

The SWB is charged with statutory responsibility for the SELA Project.  The SWB is an independently organized, municipal board created under the laws of the State of Louisiana.  R. Doc. 146, ¶ 6.  The SWB is statutorily responsible for the construction, control, maintenance, and operation of the City of New Orleans' "public water system, the public sewerage system, and the public drainage system."  La. Rev. Stat. § 33:4071.  Also pursuant to statute, the SWB

> shall have the authority over the construction of all underground work necessary or incidental to the sewerage and water systems and over all drains, inlets, catch-basins, etc., and over all connections which may be made to such drains by the city or by private persons.   Plans and specifications for any drainage connections shall be approved by the properly authorized officer of the sewerage and water board and the construction of work shall be subject to his inspection.  La. Rev. Stat. § 33:4081 (A).

The SELA Project is undoubtedly a portion of the City of New Orleans public drainage system and is currently being constructed underground, and thus, is within the territorial jurisdiction of the SWB.  *See supra* pp. 2-3; *see also Lombard*, 284 So. 2d at 914.  Indeed, both the PPA and CEA recognize the SWB's constitutional and statutory obligations for the SELA Project.  *See* Exs. O at p. 1, P at pp. 2-4.

### B.      The SWB is Contractually Responsible for the SELA Project

The SWB is contractually responsible for planning, administration, implementation, management, and funding associated with the SELA Project.  Pursuant to the CEA, the SWB has assumed the responsibilities of the CPRA under the PPA, rendering SWB centrally responsible for the SELA Project.   *See* Exs. O-P.  This role is discussed in detail above, but in summary, obligates and/or authorizes the SWB to: (1) provide lands, easements, rights-of-way, relocations, and improvements; (2) fund 100% of costs of the completed Project; (3) design the Project; (4) review and comment on all contracts and contractual issues, including negotiation of the PPA; (5) review and comment on all modifications, claims, and changes; (6) request the Corps demand

its contractors correct any failures or deficiencies; (7) conduct inspections and create punch lists for Project; (8) contribute 35% of the funding for the SELA Project construction; (9) participate in the Coordination Team to generally oversee all aspects of the Project; (10) operate, maintain, repair, rehabilitate, and replace all portions of completed Project; (11) hold and save the Corps and CPRA from all liability for the Project; and (12) partner with the Corps to carryout design and construction of the Project. *See supra* pp. 4-8.

### C.     The SWB is Financially Responsible for the SELA Project

The SWB is financially obligated to pay 35% of the costs of the SELA Project construction, as well as the costs of utility relocations, maintenance and operation of the completed Project, and property damage claims investigation and resolution.  The PPA, CEA, and DPA together obligate the SWB for 35% of the costs of the SELA Project construction, to be paid back over 30-years.  *See* Exs. C, O at pp. 3, 10, 14, P at pp. 4, 8-9, 11.   The SWB has already expended approximately $23 million for utility relocations for the Project.  *See* Exs. G-M.   Once the Project is completed, the SWB is the sole entity responsible for 100% of the costs of operating, maintaining, and repairing the Project.  *See* Exs. O at pp. 32-33, P at pp. 4, 9.  The SWB is also financially responsible for the damages caused by the SELA Project construction. *See* Exs. Q (SELA Claims Flyer); R (SELA Claims Website).

The SWB's Comprehensive Annual Financial Report for 2013-14 confirms its financial obligations for the SELA Project.  *See* Ex. S (SWB CAFR).  At Note (6)(G) in this Report, the SWB specifically recognizes the 65/35 cost sharing obligations between the Corps and SWB as set forth in the PPA and DPA, as well as the obligations of the SWB regarding the "construction and the operation, maintenance, repair, rehabilitation, and replacement of the Project."  *See id.* at p. II-53.

### D.     The SWB is Responsible for Property Damage Claims Caused by the SELA Project

In addition to its other financial responsibilities, the SWB is also responsible for the investigation and resolution of property damage claims arising out of the SELA Project construction. *See* Exs. D at p. 7, Q-R.  The SWB has hired a forensic engineering firm to assist with the obligations for investigation and resolution of property damage claims caused by the SELA Project. *See id.;* Ex. D at pp. 6-7. The SWB has also hired a contractor to assist with the SELA hotline for property damage and related complaints involving the SELA Project. *See id.* The SWB directly handles property damage claims and communicates with claimants. *See e.g.* Ex. T (SWB Letters).

### E.     The SWB's Employees are Involved in the SELA Project

The SWB has numerous employees who are involved with the SELA Project in various capacities, including but not limited to: Joseph Becker, General Superintendent; Ron Spooner, Chief of Engineering; Mubashir Maqbool, Principal Engineer, Network Engineering; Lucas Diaz, SELA Community Engagement; Robert Jackson, Director of Community and Governmental Relations; and Brenda Thornton, Community and Governmental Relations. *See* Ex. D at pp. 3-4.

### F.     The SWB is Responsible for the Design of the SELA Project

The SWB is responsible for SELA Project design and specifications. *See* Exs. D at p. 7, U (SELA Website–Project Organization).  These Project designs and specifications include pile foundations and dewatering. *See* Ex. E at p. 6.  SWB employees, Spooner and Maqbool, were the primary persons involved in the SELA Project design. *See* Ex. D at p. 7.  The SWB also hired architecture and engineering firms to assist with its obligations for SELA Project design and specifications. *See id.;* Exs. G-M.

### G.      The SWB is Involved with the SELA Project Construction

The SWB is involved in the construction of the SELA Project.  The SWB was responsible for utility relocations for the Project.  *See* Exs. G-M.  The SWB directs and requests construction work for the Project.  *See e.g.* Ex. V (SWB Emails).  The SWB is part of the Coordination Team that oversees all Project construction and related issues.  *See* Exs. O at pp. 23-24, P at pp. 9, 11, 14.  The SWB attends meetings and receives communications regarding the SELA Project construction issues, including vibration reporting and construction design and specifications.  *See id.; see e.g.* Exs V, W (Vibration Report).  The SWB also has authority to monitor and review construction-related damages and disturbances caused by the Project.  *See* Ex. X at pp. 5-6 (PA).

### H.      The SWB Acknowledges its Significant Involvement and Responsibilities for the SELA Project

The SWB has publicly acknowledged its various responsibilities for the SELA Project. For example, the SWB maintains at least two public websites for the SELA Project.  The first of which, located at http://www.swbnosela.com, states that the SWB is administering the Project with the Corps pursuant to the PPA.  *See* Ex. Y(SELA Website FAQs).  This website also recognizes certain of the SWB's responsibilities for the Project, including: completing Project design, completing design changes during construction, providing community information regarding the Project, and responding to the community's questions regarding the Project.  *See* Ex. U.  This website also notes that the SWB is responsible for 35% of the costs of the SELA Project.  *See* Ex. Z (SELA Website – Effects of Hurricane Katrina).

At a second SWB website, located at https://www.swbnoselaclaims.com/the-process/, the SWB addresses its obligation for property damage claims relative to the SELA Project.  Ex. R. The homepage states:

> The [SWB], being responsible for the major drainage operations in the City, has a partnership agreement with the [Corps] to fund 35% of the cost of their construction.  Additionally, in accordance with the agreement, the [SWB] has agreed to investigate and resolve property damage issues caused by their construction, with those costs being credited against the [SWB's] 35% contribution.  *Id.*

The SWB has also publicly acknowledged its responsibilities for the Project through public presentations, press releases, and direct mailings.  The SWB, through its representatives Jackson and Spooner, leads the presentations at public meetings for the various SELA Project phases.  *See e.g.* Ex. AA (Status Meeting Agendas).

During these meetings and through direct mailings, the SWB disseminates written materials setting forth its responsibilities for the SELA Project and property damages caused thereby.  The "Property Damage Claims Process" handout, containing the SWB logo on the front, sets forth the SWB's obligations for resolving property damages caused by the SELA Project as part of their 35% financial obligations for the Project.  *See* Ex. Q.  In addition, the SWB's SELA flyer entitled "Vibration Monitoring Program" acknowledges that the SELA Project construction activities are impacting and damaging nearby properties.  *See* Ex. BB (SELA Flyer – Vibration Monitoring Program).

## I.      SWB is Responsible for the SELA Project After Construction is Complete

After the SELA Project construction is finally complete, the SWB is the entity responsible for operation, maintenance, and repairs for the Project canals.  *See* Exs. O at pp. 14, 32-33, P at 4, 9.  The SWB also has full financial responsibility for the SELA Project post-construction.  *See id.*

Together with the applicable law discussed below, these undisputed, material facts establish the SWB's liability for inverse condemnation.

## V.          STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(a), a party may move for partial summary judgment by "identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party may support its motion for partial summary judgment by "citing to particular parts of materials in the record," such as depositions, written and documentary discovery responses, affidavits or declarations, as well as by "showing that the materials cited do not establish the…presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  *Id*. at (c)(1)(A)-(B).

While the court views summary judgment "evidence in the light most favorable to the non-movant," "[t]he non-movant must produce specific facts indicating a genuine issue for trial to avoid summary judgment."  *Cripps v. La. Dep't Agric. & Forestry*, 819 F.3d 221, 228-29 (5th Cir. 2016).  "The nonmovant's burden of demonstrating a genuine issue is not satisfied merely by creating 'some metaphysical doubt as to the material facts,' 'by conclusory allegations,' by 'unsubstantiated assertions,' or 'by only a scintilla of evidence.' "  *Krispy Krunchy Foods, LLC v. AMA Discount, Inc.*, 2016 WL 157395, at *2 (E.D. La. Jan. 13, 2016) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) ).  Thus, summary judgment is appropriate where the non-movant fails to sufficiently establish the existence of an essential element of the non-movant's case.  *Cripps,* 819 F.3d at 229 (quoting *Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744, 752 (5th Cir. 2006).

## VI.          LAW ON INVERSE CONDEMNATION

"Inverse condemnation claims derive from the Takings Clauses contained in both the Fifth Amendment of the U.S. Constitution and Article I, Section 4 of the Louisiana Constitution." *Faulk v. Union Pac. R.R. Co.*, 2014-1598 (La. 6/30/15), 172 So. 3d 1034, 1044; *Avenal v. State*, 2003-3521 (La. 10/19/04), 886 So. 2d 1085, 1104.   Pursuant to Louisiana Constitutional Article I, Section 4, "[p]roperty shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into court for his benefit."  La. Const. art. I, § 4 (B)(1).

"Where there has been a taking, the Louisiana Constitution requires compensation even though the state has not initiated expropriation proceedings in accordance with the statutory scheme set up for that purpose."  *Faulk*, 172 So. 3d at 1044.   "This 'inverse condemnation' action provides a procedural remedy to a 'property' owner seeking compensation for land already taken or damaged against a governmental or private entity having powers of eminent domain where no expropriation has commenced."  *Id.*

## VII.  *HOLZENTHAL* AND RELATED CASES DETERMINE THE SWB'S LIABILITY FOR INVERSE CONDEMNATION

Where multiple government agencies are involved in a project that results in a taking, to determine the liable agency, courts consider several factors, including which agency has ownership, control, and/or jurisdiction of the project, the source of funds for the project, and responsibilities for the project's operations, maintenance, and repair.  *Holzenthal v. Sewerage and Water Board of New Orleans*, 2006-0796 (La. App. 4 Cir. 1/10/07), 950 So. 2d 55, 66; *Vuljan v. Bd. of Comm'rs of the Port of New Orleans*, 170 So. 2d 910, 912, 913 (La. App. 4 Cir. 1965).   Thus, this issue " 'is to be decided on the facts of the individual case.' "  *Borgnemouth Realty Co., Ltd. v. Par. of St. Bernard*, 2015-1651 (La. App. 4 Cir. 5/21/14), 141 So. 3d 891, 904 (quoting *Holzenthal*, 950 So. 2d at 66).

While several cases have addressed the question of which agency is liable for a taking caused by a multiple-agency project, none are more on point and few are as recent as the decision in *Holzenthal v. Sewerage and Water Board of New Orleans*, 2006-0796 (La. App. 4 Cir. 1/10/07), 950 So. 2d 55. *Holzenthal* is particularly relevant to the present case because it addressed whether the SWB was liable for inverse condemnation caused by a previous phase of the very SELA program at issue herein.

Critically, in *Holzenthal*, the appellate court affirmed the trial court's conclusion that the SWB, and not the Corps, was the entity liable for the inverse condemnation to the plaintiffs' properties. *See id*. at 66-69. In reaching this conclusion, the appellate court extensively reviewed the jurisprudence and noted the following facts in favor of imposing liability on the SWB. *See id.*

First, the *Holzenthal* court identified several provisions of the PCA entered into by the SWB and the Corps, which is also discussed above. *See id* at. 67-68; *see also* Ex. N. These highlighted PCA provisions include:

(1) allowing the SWB to review and comment on solicitations for contracts, including contracts for plans and specifications, to review and comment on contract modifications and change orders, to review and comment on all contract claims;

(2) allowing the SWB to request that the Corps accomplish betterments for the Project;

(3) requiring the SWB to contribute 25 to 50 percent of the cost of the Project;

(4) providing for consultation by the Corps with the SWB to determine lands, easements, and rights of way for the Project;

(5) creating a Project Coordination Team, with representatives from the Corps and SWB, which generally oversee Project issues, such as design, plans, specifications, scheduling, contracts, costs, creditable work, and which made recommendations to the Corps' District Engineer;

(6) requiring the SWB to hold and save the Corps free from all damage arising from the Project, except for damages due to the fault or negligence of the Corps or its contractors. *See id.*

The court concluded that the SWB's "continuing input and consultation" are required by the PCA weighed in favor of the SWB's liability for inverse condemnation. *See id.* at 68.

The *Holzenthal* court next concluded that the SWB's liability for inverse condemnation was supported by the fact that: (1) "at the completion of the project, the public improvement would be operated and maintained by the [SWB]," and (2) "title to the servitudes remained in the [SWB] and were not transferred to the United States." *Id.* at 68.

The final factor the *Holzenthal* court considered in finding the SWB liable was that, unlike cases in which the federal entity was found responsible, in *Holzenthal,* the Corps did not have exclusive jurisdiction and control over the Project. *See id.*

The conclusion in *Holzenthal,* that the SWB is the liable entity, is consistent with the U.S. Supreme Court's holding in *Griggs v. County of Allegeny*, 369 U.S. 84 (1962). In *Griggs*, the state entity was held liable to property owners for a taking related to an airport that was authorized and partially funded by the federal government. In reaching this holding, the Supreme Court reasoned that the state entity was liable because it owned and maintained the airport and it designed the airport, while the federal entity was only involved in promulgating the rules and plan for the airport and sharing 50-70% of the costs of the airport. *See id.*

Older cases from Louisiana courts have determined agency liability for a taking based upon reasoning similar to that in *Holzenthal* and *Griggs*. For example, courts have concluded that a local, state entity was liable where it was responsible for the operation, maintenance, and repair of the project and/or property at issue. *See Danziger v. United States*, 93 F.Supp. 70, 72 (E.D. La. 1950); *Borgnemouth*, 141 So. 3d at 904; *W. Jefferson Levee Dist. v. Coast Quality*

*Constr. Corp.*, 620 So. 2d 319, 329 (La. App. 5 Cir. 1993).   In contrast, where courts have identified the federal entity as responsible for a taking, this decision was based upon the federal entity's exclusive jurisdiction and control of the project at issue.  *See Vuljan*, 170 So. 2d at 911-12; *Petrovich v. State*, 181 So. 2d 811, 814 (La. App. 4 Cir. 1966).

### VIII.       APPLICATION OF *HOLZENTHAL* RENDERS THE SWB LIABLE TO PLAINTIFFS FOR INVERSE CONDEMNATION

Liability for Plaintiffs' inverse condemnation claims is easily imputed to the SWB based upon *Holzenthal* and related cases, together with the undisputed, material facts in this case. The SWB's involvement and responsibilities for the SELA Project in this litigation are almost indistinguishable from the SWB's prior involvement and responsibilities for earlier phases of the SELA program in *Holzenthal*, where the court identified the SWB as the entity liable for inverse condemnation.  These numerous similarities are addressed as follows:

In *Holzenthal*, the SWB was permitted to review and comment on contractual issues such as solicitations, plans, specifications, modifications, change orders, and contract claims; here, the SWB has the same authority under the PPA and CEA.  *See* 950 So. 2d at 67-68; *compare* Exs. O at pp. 8-9, P at pp. 4, 8-9.

In *Holzenthal*, the SWB was allowed to request the Corps accomplish betterments; here, the SWB is similarly allowed under the PPA and CEA to request the Corps to address defects or failures by the contractors.  *See* 950 So. 2d at 67-68; *compare* Exs. O at p. 10, P at p. 4-8-9.

In *Holzenthal*, the SWB was required to contribute 25 to 50 percent of the costs; here, the SWB is required to contribute 35% of the SELA Project costs.  *See* 950 So. 2d at 67-68; *compare* Exs. O at pp. 3, 10, 14, P at pp. 4, 8-9, 11.

In *Holzenthal*, the SWB consulted with the Corps regarding lands, easements, and rights-of-way for the construction; here, the SWB is responsible for furnishing the lands, easements,

rights of way, relocations, and improvements for the Project.  *See* 950 So. 2d at 67-68; *compare* Exs. O at p. 2, 11, P at pp. 4, 8-9.

In *Holzenthal*, the SWB participated in the Project Coordination Team to oversee all aspects of the construction; here, the SWB participates in the Coordination Team to oversee the SELA Project and attends regular meetings of the Coordination Team.   *See* 950 So. 2d at 67-68; *compare* Exs. O at p. 23-24, P at pp. 11, 14.

In *Holzenthal*, the SWB was required to hold and save the Corps from liability arising from the construction; here, the SWB is required to hold and save both the Corps and CPRA from liability arising from the construction.  *See* 950 So. 2d at 67-68; *compare* Exs. O at pp. 3, 33-34, P at pp. 12-13.

In *Holzenthal*, the SWB was responsible for the operation and maintenance of the project upon completion; here, the SWB is responsible for the operation, maintenance, repair, replacement, and rehabilitation, as well as all costs thereof, of the SELA Projection upon completion.  *See* 950 So. 2d at 67-68; *compare* Exs. O at pp. 3, 10, 14, 32-33, P at pp. 4, 9.

In *Holzenthal*, title to the servitudes remained with the SWB and were not transferred to the Corps; here, at all times, the SELA Project was in the territorial jurisdiction of the SWB and there are no facts to suggest that at any time the SELA Project or related property or servitudes was transferred to the Corps or CPRA.  *See* 950 So. 2d at 67-68; *compare see supra* at p. 9.

In *Holzenthal*, the Corps did not have exclusive jurisdiction and control over the project; here, at all times, the SELA Project was in the territorial jurisdiction of the SWB and there are no facts to suggest that any time the Corps or the CRPA had exclusive jurisdiction or control over the Project.  *See id.*

Even if these substantial similarities between the SWB's role and responsibilities in *Holzenthal* and its role and responsibilities in the present case are insufficient to demonstrate SWB's liability for inverse condemnation (which Plaintiffs adamantly dispute), the SWB has further involvement in the Project that justifies imposing liability.  For one, the SWB is responsible for the investigation, resolution, and payment of property damage claims caused by the SELA Project, the very claims that give rise to Plaintiffs' inverse condemnation.  *See* Exs. D at pp. 6-7, Q-R.

Other facts too are compelling for imposing liability upon the SWB.  The SWB has already expended approximately $23 million for utility relocations for the Project.  *See* Exs. G-M. The SWB is responsible for design and specifications of the Project and is involved in the construction of the Project.  *See id.*; Exs. D at p. 6, E at p. 6, O-P, U-X.  The SWB holds itself out as responsible for the SELA Project through its public SELA Project websites, community meetings, mailings, and flyers.  *See* Exs. Q-R, U, Y-BB.

Neither the Corps nor the CPRA has nearly as much involvement and/or responsibilities for the SELA Project as the SWB.  The Corps is involved with the Project insofar as federal funding from the U.S. Congress and hiring the Contractors and monitoring their work on the Project, but the Corps does not have any ownership of the Project and its responsibilities apparently end when construction is completed.  *See* Exs. E at p. 3, O-P, U.

The CPRA's role in the Project is even more minimal.  The CRPA's most significant connection to the Project is its signature on the PPA; yet, the CRPA signed the PPA "over objection."  Ex. O at p. 4.  This signature is merely perfunctory, as the CEA obligates the SWB - the entity with territorial jurisdiction over the Project and drainage responsibilities for the City of

New Orleans - to carryout all of the CPRA's responsibilities for the SELA Project.  *See* Exs. O-P.  Thus, the CPRA has no meaningful involvement in the Project.

IX.        **CONCLUSION**

The undisputed, material facts in this case establish that the SWB, and not the Corps, the CPRA, or any other government agency, is liable for Plaintiffs' inverse condemnation claims as a matter of law.  *Holzenthal* and related cases compel this conclusion based upon the SWB's extensive involvement in the SELA Project.  The SWB has constitutional, contractual, and statutory responsibility for the Project; it owns and controls the Project; it designed the Project; it partially financed Project construction; and it will operate, fund, and maintain the Project when construction is complete.  The SWB has also contractually agreed and publicly represented that it will pay for property damages arising out of Project construction.  As a matter of law, then, the SWB is the government agency that is liable for the inverse condemnation to the Plaintiffs' properties.

Respectfully submitted:

**BRUNO & BRUNO, LLP**

*/s/ Joseph M. Bruno*
Joseph M. Bruno (La. Bar No. 3604)
Daniel A. Meyer (La. Bar No. 33278)
855 Baronne Street
New Orleans, LA 70112
Telephone: (504) 525-1335
Fax: (504) 581-1493
jbruno@brunobrunolaw.com
dmeyer@brunobrunolaw.com


AND

Michael T. Whitaker (*Pro Hac Vice*)
The Whitaker Law Firm

100 Dolores Street
Carmel, CA 93923
Telephone: (831) 624-5556
Fax: (831) 624-5509
michaelwhitaker@whitakerlaw.net


ATTORNEYS FOR PLAINTIFFS


## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of September 2016, I served a copy of the foregoing

on all counsel of record by filing through the Court's CMECF e-filing system.


*/s/ Joseph M. Bruno*
JOSEPH M. BRUNO